UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE: 2005 UNITED STATES GRAND     )     Master Docket No.
PRIX ,                              )     1:05-cv-914-SEB-VSS

**<u>ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS</u>**

This matter is before the Court on various motions to dismiss Plaintiffs' Third Amended Complaint by Defendants, Fédération Internationale de L'Automobile ("<u>FIA</u>"); Formula One Administration, Ltd ("<u>FOA</u>"), Formula One Management ("<u>FOM</u>") (collectively FOA and FOM are the "<u>Formula One Group</u>"); Indianapolis Motor Speedway Corporation ("<u>IMS</u>"); Michelin North America, Inc. ("<u>Michelin</u>"); Scuderia Ferrari Marlboro ("<u>Ferrari</u>"); and Mile Seven Renault F1 Team, BMW Williams F1 Team, Lucky Strike BAR Honda, Panasonic Toyota Racing, Red Bull Racing, Sauber Petronas, West McLaren Mercedes (collectively the "<u>Michelin Teams</u>").[1] The Third Amended Complaint (the "Complaint")[2] asserts claims for breach of contract, third-party beneficiary, promissory estoppel, negligence, tortious interference with a contractual relationship, and unjust enrichment arising out of events surrounding the 2005 United States Grand Prix Formula One automobile race (the "Race"), which occurred on June 19,

---

[1] Separate motions were filed by FIA, Formula One Group, IMS, Michelin, Ferrari, and the Michelin Teams respectively.

[2] Defendants' motions refer to the Complaint as Plaintiffs' Second Amendment Complaint, but that pleading was subsequently amended and became the Third Amended Complaint. That change does not affect the analysis contained in the various briefs or in this opinion.

2005, in Indianapolis. Plaintiffs were spectators who attended the Race, coming from across the nation and around the world, who claim economic injury resulting from the withdrawal of the Michelin Teams and their fourteen drivers immediately prior to the official start of the Race, thereby leaving only three teams and six drivers to compete. Plaintiffs seek to recover all their expenses incurred in connection with attending the Race, including ticket costs, travel expenses, and the food they consumed, as well as awards of punitive damages. Defendants contend, among other grounds in support of for dismissal of this lawsuit,[3] that Plaintiffs have failed to state any actionable claim for relief. For the reasons explained below, we share with Defendants' assessment and hereby <u>GRANT</u> with prejudice Defendants' Motions to Dismiss.

## Factual Background

On June 19, 2005, approximately 100,000 people came from throughout the United States and around the world to the IMS to attend the 2005 United States Grand Prix, the only Formula One Championship Series Race hosted in the United States. The Race, as with all other Formula One League Races, was extensively promoted as a Regulation Formula One Championship Series Race, with ten teams competing and a total of twenty cars and drivers. Compl. ¶¶ 1, 29.

In practice sessions held two days prior to the Race on June 17, 2005, two of the teams using Michelin tires experienced tire failures. Compl. ¶ 32. On the day prior to the

---

[3] Because we find Plaintiffs have failed to present an actionable claim, we decline to address as moot the various other grounds raised by Defendants.

2

Race, Michelin advised the FIA[4] in writing that "Michelin has, in the sole interest of safety informed its partner teams that we do not have total assurance that all tyres that qualified the cars can be used unless the vehicle speed in turn 13 can be reduced." Compl. ¶ 39; Michelin Letter Dated June 18, 2005 (Compl. Ex. A). On the day of the Race, June 19, 2005, an FIA-authorized representative responded in writing to the Michelin letter, chastising Michelin for not supplying its teams with a set of back-up tires and suggesting that Michelin "inform your teams what is the maximum safe speed for their cars in Turn 13." Compl., ¶ 40; FIA Letter dated June 19, 2005 (Compl. Ex. B). The FIA's response also included proposed solutions to the tire problem suggested by some of the racing teams, including: (1) the addition of a chicane[5] in Turn 13 to slow car speeds, (2) the possibility of the Michelin Teams racing on tires not used in qualifying, and (3) the possibility of the Michelin Teams repeatedly changing the affected tire[6] during the Race. In rejecting these suggestions, the FIA replied: (1) the addition of a chicane "would be a breach of the rules and grossly unfair to those teams that have come to Indianapolis with the correct tyres;" (2) allowing teams to race with a tire which was not used in qualifying "would be a breach of the rules" and would carry an undefined penalty which "would

---

[4] FIA maintains is a not-for-profit organization that sanctions and officiates Formula One events such as the 2005 U.S. Grand Prix. See FIA's Brief in Supp. at 1.

[5] The term "chicane" apparently refers to an obstacle that can be added to the racecourse which, in this case, would force the participating cars to operate at a slower speed in order to maneuver around the obstacle.

[6] Michelin allegedly informed the Michelin Teams that the left rear tire was safe for a maximum of ten laps at full speed.

have to be heavy enough to ensure that no team was tempted to use [non]qualifying tyres in the future;" and (3) allowing teams to repeatedly change the affected tire during the Race would not generate a penalty only "[i]f the technical delegate and stewards were satisfied that each change was made because the tyre would otherwise fail;" however, "[i]f this meant using tyres additional to a teams' allocation, the stewards would consider all the circumstances in deciding what penalty, if any, to apply." FIA Letter dated June 19, 2005 (Compl. Ex. B).

Over the course of several hours prior to the race, negotiations occurred among the Defendants in an effort to resolve the Michelin tire problem. Compl. ¶ 41. Several proposals were advanced as a way to permit the 2005 USGP to go forward, but no agreement was reached because the FIA and Ferrari, which uses Bridgestone tires, refused to agree to the solutions acceptable to the other teams. Compl. ¶¶ 43, 44. As a result of these pre-Race negotiations, an understanding was reached by the Defendants that the Michelin Teams would participate in the formation lap and then exit the circuit prior to the official start of the Race. Compl. ¶ 44. After the Michelin Teams dropped out, the Race was held among the three remaining teams and six drivers. Compl. ¶¶ 48.

Plaintiffs complain that Defendants continued clear up to the running of the formation lap to state publicly that the tire problem would be resolved and a full complement of twenty drivers would be competing in the Race, despite the evident problem with the Michelin tires. Compl. ¶¶ 2, 33.

The Plaintiffs are all individual spectators who purchased or otherwise obtained

tickets to attend the Race. Compl. ¶ 5. Each of these tickets clearly states on the front: "NO REFUND." On the back, each ticket expressly and unequivocally disclaims liability on the part of the Indianapolis Motor Speedway and any "affiliates or participants" in the Race. The disclaimer states:

> The holder of this ticket expressly assumes all risk incident to the event, whether occurring prior to, during or subsequent to the actual conduct of the event, and agrees that all event participants, sanctioning bodies, IMS, FOA, Formula One Management Limited, Allsopp Parker & Marsh Limited, Allsport Management, FIA, ACCUS, USAC and all directors, officers, members, shareholders, owners, affiliates, employees and agents of each of the foregoing are hereby released from any and all claims arising from the events, including claims of negligence.
>
> The holder of this ticket agrees not to take any action, or cause others to take any action, which would infringe on IMS' or FOA's rights. Use of this ticket constitutes acceptance of these terms. IMS reserves the right to revoke this ticket by refunding the printed purchase price.

2005 United States Grand Prix Ticke (IMS' Brief in Supp. Ex. A).

On June 20, 2005, this lawsuit was filed, the first of ten class action lawsuits brought in response to the events surrounding the Race. The ten lawsuits have been consolidated into this present action.

## Legal Analysis

I.   *Standard of Review*

A motion to dismiss tests the sufficiency of the complaint. Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990). Dismissal for failure to state a claim upon which relief can be granted is appropriate where, in reviewing the complaint and "taking

as true all of [the plaintiff's] well-pleaded factual allegations and drawing all reasonable inferences in his favor," it is clear that no viable cause of action exists. Lachmund v. ADM Investor Services, Inc., 191 F.3d 777, 782 (7th Cir. 1999); see Beam v. IPCO Corp., 838 F.2d 242, 244 (7th Cir. 1988). "[W]ell pleaded allegations of the complaint are to be taken as admitted, but mere unsupported conclusions of fact or mixed fact and law are not admitted." Northern Trust Co. v. Peters, 69 F.3d 123, 129 (7th Cir. 1995).

II.   *Plaintiffs Have Not Asserted Any Actionable Injury.*

Defendants contend that the essence of Plaintiffs' lawsuit is that, as spectators at the Race, they did not get what they expected, but that, under established law, a spectator's subjective opinion that the quality of the event was less than or other than expected is simply not actionable. Plaintiffs respond that their "Complaint is founded upon the deprivation of objectively verifiable contractual rights—i.e. (1) 'a race,' (2) a race wherein the Defendants complied with their own rules and contractual provisions, and (3) a race wherein substantially more than six cars participated." Pls.' Resp. Brief at 1.

The uniform weight of established case law holds that a failure to satisfy the subjective expectations of spectators at a sporting event is not actionable under law. See, e.g., Seko Air Freight, Inc. v. Transworld Systems, Inc., 22 F.3d 773, 774 (7th Cir. 1994) ("Consider too the purchaser of season tickets for a baseball team. That the Chicago Cubs turn out to be the doormat of the National League would not entitle the ticket holder to a refund for the remaining games, any more than the star tenor's laryngitis

6

entitles the opera goer to a refund when the understudy takes over the role."); Charpentier v. Los Angeles Rams Football Co., Inc., 89 Cal. Rptr. 2d 115, 124 (Cal. App. 1999) ("But plaintiff did not buy the right to watch a good team or to have enlightened (in his opinion) management decisions made.  In short, the Rams were not beholden to plaintiff to operate as he might have preferred, nor was the team required to repay local fans' loyalty by declining other opportunities. Plaintiff's recourse was to give up on the team when he felt it had given up on him. It is common knowledge that professional sports franchisees have a sordid history of arrogant disdain for the consumers of the product." (internal citation and parenthetical omitted)); Beder v. Cleveland Browns, Inc., 717 N.E. 2d 716, 720-21 (Ohio App. 1998) ("That the Browns performed poorly after the announced move to Baltimore cannot serve as a basis from which to find that the Browns breached their contract with season ticket holders.  To allow recovery under such a theory would enable any ticket holder not satisfied with the performance of whatever entertainment the ticket procured to seek a refund for such a subjective and unreasonable response." (internal citations omitted)); Strauss v. Long Island Sports, Inc., 60 A.D.2d 501, 510 -11 (N.Y. App. Div. 1978) ("Assuming, as plaintiff does, that every person who bought a season ticket did so in the expectation that Dr. J would play for the Nets, any such expectation was unreasonable as a matter of law . . . .   [T]he risk that Dr. J might not be playing for the Nets might fairly be regarded as within the risks that a purchaser assumed under the contract." (internal quotation omitted)); see also Bickett v. Buffalo Bills, Inc., 122 Misc. 2d 880, 882 (N.Y. Sup. 1983) ("A ticket is but a license . . . [m]oreover, a ticket to an

entertainment performance or activity does not create a right in rem").

In view of this substantial body of case law, Plaintiffs concede that they cannot recover based on their subjective expectations; see Pls.' Resp. Brief at 7 ("The Defendants are correct in their assertion that the Plaintiffs may not premise their recovery upon subjective expectations") Plaintiffs here, however, ingeniously claim that they, unlike all the previously cited disgruntled sports fans, are basing their claims on "objectively verifiable contractual expectations," to wit: "Plaintiffs assert they expected the Defendants to abide by their own rules, contracts, and representations concerning the presentation of a regulation race with substantially more than six cars participating." Pl.'s Resp. Brief at 7. Plaintiffs' attempt to frame their claims as "objective" contract expectations is nothing more than a red herring, for the following reasons:

First, Plaintiffs' arguments about "objective" exceptions are thinly-veiled recastings of the same arguments rejected in Castillo v. Tyson, despite Plaintiffs' attempts to distinguish that holding. We quote at length below from the Castillo decision because of its close parallel to the case at bar:

> Plaintiffs claim that they were entitled to view a "legitimate heavyweight title fight" fought "in accordance with the applicable rules and regulations" of the governing boxing commission, i.e., a fight that was to end either in an actual or technical knockout or by decision of the judges after 12 rounds, and that they are entitled to their money back because the fight ended in a disqualification. Many legal theories are invoked in support of this claim–breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, breach of express and implied warranties, tortious interference with contractual relations, "wantonness", fraud, negligent representation–none of which have merit. Plaintiffs are not

8

> in contractual privity with any of the defendants, and their claim that they are third-party beneficiaries of one or more of the contracts that defendants entered into among themselves was aptly rejected by the motion court as "contrived". Nothing in these contracts can be understood as promising a fight that did not end in a disqualification. The rules of the governing commission provide for disqualification, and it is a possibility that a fight fan can reasonably expect. Plaintiffs could not reasonably rule out such a possibility by the boxer's and promoters' public statements predicting a "sensational victory" and "the biggest fight of all time", and assuming other representations were made promising or implying a "legitimate fight", there can be no breach of warranty claim absent privity of contract between plaintiffs and defendants, and also because defendants provided only a service.

268 A.D.2d 336, 337 (N.Y. App. Div. 2000) (internal citations omitted). Plaintiffs' claims in the case at bar suffer from many of the same deficiencies noted above, including, as Defendants explained:

(1) "[M]otor car racing is an inherently dangerous sport that involves numerous safety issues, and the rules governing the event clearly provided for the type of safety-related reduction of participants that occurred here. . . . In fact, the rules even provide for complete cancellation or suspension of a race for safety or other reasons." (Certain Defendants' Reply Brief at 3, 4)

(2) "In a dangerous sport where the rules recognize safety as a paramount concern, the risk that some cars might not be able to compete because of safety reasons 'might fairly be regarded as within risks that a purchaser assumed under the contract.'" (Certain Defendants' Reply Brief at 5 (quoting Strauss, 60 A.D.2d at 511))

Further, Plaintiffs are neither parties to nor in privity with any of the third-party

contracts they seek to enforce. Indeed, at the time they purchased or otherwise obtained their tickets, Plaintiffs could not have known the language of the third-party contracts they seek to enforce and could not have formed expectations based thereon.[7] In light of this substantial factual overlap between the case before the Court and the Castillo decision, we find no basis on which to distinguish Plaintiffs' present legal arguments from those rejected in Castillo.

In addition, the tickets to the Race explicitly state "NO REFUND" and unequivocally disclaim responsibility for such losses, providing that "[t]he holder of this ticket expressly assumes all risk incident to the event, whether occurring prior to, during or subsequent to the actual conduct of the event, and agrees that all event participants, sanctioning bodies, IMS, FOA, [FOM], . . . FIA . . .are hereby released from any and all claims arising from the events, including claims of negligence." These clear statements put Plaintiffs on notice that they, as spectators, when purchasing the tickets to the Race assumed the risk of Michelin tire non-performance and any expectations to the contrary were not "objective verifiable contractual rights."

Plaintiffs' broad assertion that as spectators they have an "objective" basis for a lawsuit anytime a particular sports' governing rules are broken is not plausible; if that were the law, spectators would have a viable cause of action permitting challenges to some part or another of almost every single sporting event requiring a ticket for

---

[7] Indeed, the primary contract and rules that Plaintiffs claim were violated are subject to a protective order and have been submitted to the Court under seal.

admission.  We suspect that a knowledgeable and neutral observer (a hypothetical construct if there ever was one) would be hard pressed, after watching any professional (or amateur) sporting event, not to discern at least one "blown call."  In fact, it has become a post-event ritual for fans of a losing team/driver/competitor to cite as the cause of defeat an official decision that "should have gone the other way" and to relive the could-have, should-have, would-have scenarios that play out if only the rules had been enforced the way the disappointed fans believe they should have been.  Grousing about the judgment calls/rulings of officials in a sporting event is part and parcel of being a sports fan; and it most assuredly is not a legitimate basis for claiming a legally actionable injury.

      Plaintiffs' claimed "objective" expectations that Defendants would and ought to abide by their own rules actually reflect their "subjective" opinions as to which rules they believe should have been enforced.  In their Surreply Brief, Plaintiffs "assert there were safe alternatives to not racing and the Defendants, with nefarious motives, chose not to pursue such alternatives." Pls.' Surreply Brief at 2.  We wonder what the evidence might prove to be that would establish such "nefarious motives," if this case were to survive the motion to dismiss, but more importantly Plaintiffs' Complaint contains no pleading allegations (nor do their briefs elaborate) what the safe alternatives might have been to the Michelin Teams' decision not to race which alternatives were also *consistent* with the Formula One rules that Plaintiffs seek to enforce.  Plaintiffs' own submissions disclose that the FIA had indicated prior to the Race that the addition of a chicane, the only

11

alternative actually identified by Plaintiffs, would have been violative of the rules and that the other proposed accommodations would have been similarly problematic.  Plaintiffs' arguments become circular when, under their theory, they contend that Defendants should have broken certain rules in order to enforce other rules; we note, as well, that the breaking of either rule would arguably have violated the "objective" expectations of the spectators.[8]  Selectively picking and choosing among the rules to create a cause of action based on Plaintiffs' belief that FIA should have enforced some but not all of those rules is not a claim based on objective criteria or entitlements.

Plaintiffs' claims challenge the discretion and judgment of sports competitors, who are persons with whom they have no contractual relationship or parity.  The Michelin Teams' decision to withdraw from the Race, instead of racing, thereby avoiding not only various penalties but potentially life threatening injuries to themselves and other drivers, is a decision properly vested in the them, given that they have by far the must important and real interests at stake.  It's to be assumed that the Michelin Teams made the decision they believed to be in their best competitive and professional interests, and in doing so,

---

[8] This analysis assumes *arguendo* that the Race amounted to violation of Defendants' own rules.  In their briefs, Plaintiffs merely assert that they "objectively" expected "a race wherein substantially more than six cars participated."  Plaintiffs do not, however, ever identify the minimum number of cars that a spectator can "objectively" expect to participate in a particular competition nor do Plaintiffs identify a specific rule requiring that "substantially more than six cars" participate in a race.  Under Plaintiffs' formulation, if ten cars had withdrawn and four had crashed, we wonder if the spectators' "objective" expectations would have been fulfilled.  Or, what if five had withdrawn and ten crashed?  Plaintiffs offer no legally based guidance on these questions in defending the viability of their lawsuit and they never identify the limits, if any, on their "objective" expectations.

they owed no legal duty to let the preferences of the spectators trump their own good judgment.

The weakness of Plaintiffs' theory is revealed by analogizing to the college football coach who must suspend certain star players from playing in a bowl game because of infractions of team or school rules, or the NBA coach who benches a star player for insubordination. Although the spectators who have paid to attend the contest may quarrel with the coaches' decisions and be disappointed by the consequences of the coaches' determinations, the power to make those decisions is the implicit–perhaps even explicit–risk that sports fans assume when they buy a ticket of admission to a sporting event. In none of these situations is an ex post facto legal analysis of the issue of the "objective" correctness of a decision by the person or entity having that discretion and power within the proper purview of the courts.

The events surrounding the Race, at most, yielded a non-actionable loss of goodwill on the part of the Defendants. We have no doubt that the events that transpired at the 2005 Race indisputably upset many people, participants and spectators alike–creating strong commercial incentives on the part of the Defendants to do everything within their power to prevent a repeat of the 2005 collapse in the future. The actions taken and public statements made by the Defendants in the ensuing days and weeks after the scaled-down Race strongly indicate that they intend to avoid any future losses of spectator goodwill, as evidenced by their *voluntary* reparations to the individual fans and ticket holders (which, interestingly, Plaintiffs' counsel opposed). Any further

13

grievance or disgruntlement on the part of Plaintiffs must be pursued, if at all, in the marketplace, through fan withdrawal of money and attendance at future race events.

Plaintiffs' claims are based on their subjective expectations, a legal theory that has been unanimously rejected by every court to address it.  Finding no grounds to decide otherwise here, we shall follow their compelling lead.

## Conclusion

Plaintiffs have failed to state a claim upon which relief can be granted. Accordingly, pursuant to Rule 12(b)(6), F.R. Civ. P., we <u>GRANT</u>  Defendants' Motions to Dismiss with prejudice.  IT IS SO ORDERED.

Date:  06/15/2006

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copy To:

Matthew Gordon Allison
BAKER & MCKENZIE LLP
matthew.g.allison@bakernet.com

William Bock III
KROGER GARDIS & REGAS
wb@kgrlaw.com

Stephen E. Arthur
HARRISON & MOBERLY
sarthur@h-mlaw.com

Peter E. Borkon
SCHUBERT & REED LLP
pborkon@schubert-reed.com

Raymond A. Basile
HARRISON & MOBERLY
basile@h-mlaw.com

James McGinnis Boyers
WOODEN & MCLAUGHLIN LLP
jboyers@woodmaclaw.com

Reynolds B. Brissenden
KROGER GARDIS & REGAS
rbb@kgrlaw.com

Lawrence F. Carnevale
CARTER LEDYARD & MILBURN LLP
carnevale@clm.com

Richard P. Cassetta
BRYAN CAVE LLP
richard.cassetta@bryancave.com

KC Cohen
KC COHEN LAWYER, PC
kc@esoft-legal.com

Thomas Anthony Doyle
BAKER & MCKENZIE LLP
thomas.a.doyle@bakernet.com

James J. Dries
BAKER & MCKENZIE
james.j.dries@bakernet.com

Larry D. Drury
ldrurylaw@aol.com

Robert L. Gauss
ICE MILLER LLP
gauss@icemiller.com

Jeff S. Gibson
COHEN & MALAD LLP
jgibson@cohenandmalad.com

Steven P. Handler
MCDERMOTT WILL & EMERY LLP
shandler@mwe.com

Gabriel Adam Hawkins
PRICE WAICUKAUSKI RILEY & DEBROTA
ghawkins@price-law.com

Peter W. Herzog III
BRYAN CAVE LLP
pwherzog@bryancave.com

Michael B. Hyman
MUCH SHELIST
mbhyman@muchshelist.com

James A. Knauer
KROGER GARDIS & REGAS, LLP
jak@kgrlaw.com

Offer Korin
KATZ & KORIN
okorin@katzkorin.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Kurtis Allen Marshall
KROGER, GARDIS & REGAS LLP
kam@kgrlaw.com

David M. Mattingly
ICE MILLER LLP
david.mattingly@icemiller.com

Curtis W. McCauley
ICE MILLER LLP
mccauley@icemiller.com

John K. McDavid
LOCKE REYNOLDS LLP
jmcdavid@locke.com

Derek J. Meyer
MCDERMOTT WILL & EMERY LLP
227 W. Monroe Street
Suite 5200
Chicago, IL 60606

Shon Morgan
QUINN EMANUEL URQUHART OLIVER & HEDGES
shonmorgan@quinnemanuel.com

Eric S. Pavlack
COHEN & MALAD LLP
epavlack@cohenandmalad.com

Stephanie A. Petersmarck
MCDERMOTT WILL & EMERY LLP
spetersmarck@mwe.com

Henry J. Price
PRICE WAICUKAUSKI RILEY & DEBROTA
hprice@price-law.com

Bernard Lowell Pylitt
KATZ & KORIN
bpylitt@katzkorin.com

Hugh E. Reynolds Jr.
LOCKE REYNOLDS LLP
hreynolds@locke.com

Mark James Richards
ICE MILLER LLP
mark.richards@icemiller.com

James W. Riley Jr.
RILEY BENNETT & EGLOFF LLP
jriley@rbelaw.com

William N. Riley
PRICE WAICUKAUSKI RILEY & DEBROTA
wriley@price-law.com

Robert C. Schubert
SCHUBERT & REED LLP
rschubert@schubert-reed.com

Robert J. Schuckit
SCHUCKIT & ASSOCIATES, P.C.
rschuckit@schuckitlaw.com

Richard E. Shevitz
COHEN & MALAD LLP
rshevitz@cohenandmalad.com

A. William Urquhart
QUINN EMANUEL URQUHART OLIVER & HEDGES
billurquhart@quinnemanuel.com

Scott Watson
QUINN EMANUEL URQUHART OLIVER & HEDGES
scottwatson@quinnemanuel.com

James L. Welsh III
PAYNE WELSH & KLINGENSMITH
jwelsh@pwklawyers.com

William P. Wooden
WOODEN & MCLAUGHLIN LLP
wwooden@woodmaclaw.com

Sally F. Zweig
KATZ & KORIN
szweig@katzkorin.com